**STATE of Tennessee**

v.

**Robert Lewis CARPENTER, Jr.**

Court of Criminal Appeals of Tennessee, at Jackson.

Aug. 29, 2001.

Application for Permission to Appeal Denied by Supreme Court Dec. 27, 2001.

Robert L. Hutton, Glankler Brown, PLLC, Memphis, TN, for appellant.

Paul G. Summers, Attorney General and Reporter; Michael Moore, Solicitor General; Mark E. Davidson, Assistant Attorney General; Elizabeth T. Rice, District Attorney General, for appellee, State of Tennessee.

## OPINION

DAVID G. HAYES, J., delivered the opinion of the court, in which JERRY L. SMITH and ALAN E. GLENN, JJ., joined.

The Appellant, Robert Lewis Carpenter, Jr., was indicted by a Fayette County Grand Jury for one count of premeditated murder, one count of felony murder, one count of especially aggravated kidnapping, and one count of especially aggravated robbery. Carpenter waived both his right to a trial by jury and his right to have a jury determine punishment. On June 15, 2000, a bench trial was held and Carpenter was found guilty on all counts.[1] Following the sentencing hearing, the trial court sentenced Carpenter to life without the possibility of parole, based upon its finding of three aggravating circumstances (Tenn. Code Ann. § 39–13–204(i)(5), (i)(6) and (i)(7)). On appeal, Carpenter raises three

---

1. The felony murder count was merged with the premeditated murder count.

issues for our review: (1) Whether the trial court erred in its application of aggravating circumstance (i)(5), *i.e.*, the murder was especially heinous, atrocious or cruel; (2) whether the trial court erred in failing to find specific mitigating circumstances; and (3) whether Carpenter's convictions violate double jeopardy principles and the International Covenant on Civil and Political Rights, based upon his prior convictions for federal crimes arising from the same factual circumstances. After review, we find no error and affirm the judgment of the trial court.

## Factual Background

On June 15, 1999, Robert Lee and Barbara Ann Lee, husband and wife of thirty-nine years, were preparing for a vacation they had planned to take the next day. Mrs. Lee, the victim, had completed several errands that morning, including purchasing clothes at Eddie Bauer and the withdrawal of $200.00 from their bank account, when she stopped at the Sonic Drive–In in Collierville. The victim was driving her recently purchased 1997 green Chevrolet Blazer and was accompanied by Otis, her dog and regular companion. Because the victim frequented that particular Sonic on a regular basis, Sharon Bryson, a car hop, recognized the victim and her dog. As Bryson exited the restaurant with the victim's food, she observed the following:

> Well, I was on my way out with the lady's order. I seen this black guy sitting in the back of this woman's vehicle. I knew that was strange and very odd. Normally, it would be her and her dog, and then I leaned on over a little bit, and I seen another guy standing outside the driver's side of her vehicle with a gun.

Bryson immediately ran inside and told her manager to call 911, which he did.

Detectives Scott Young and Gamon Hill, of the Collierville Police Department, responded to the 911 call. As they interviewed Bryson, she stated that the man holding the gun was wearing a light blue wind-breaker suit and had been walking around the building earlier that same day. During the investigation, officers discovered an unattended blue Buick LeSabre with a tan top parked at a NAPA auto parts store approximately 100 yards away. Further investigation revealed that the Buick was registered to the Appellant, Robert Lewis Carpenter, Jr., whom Detective Young knew personally. Detective Young immediately notified Fayette County law enforcement officers to be on the lookout for the Appellant or the victim's Blazer. Inside the car, Detective Young found a Sonic cup containing a "fresh drink." He also discovered a previous traffic citation and envelope documenting the Appellant's address as being in Fayette County.

Criminal Investigator Chuck Pugh, of the Fayette County Sheriff's Department, also knew the Appellant personally and lived two miles from the Appellant's residence. On this particular day, Investigator Pugh was at his residence eating lunch when he received a dispatch requesting that he drive by the Appellant's home in search of the Appellant or the Blazer. As Investigator Pugh was driving by the Appellant's residence, he met the Blazer coming out of the driveway. He recognized the Appellant as the person driving the Blazer and observed two other passengers in the vehicle. An immediate high-speed pursuit ensued. Detective Ricky Wilson, of the Fayette County Sheriff's Department, also personally knew the Appellant and participated in the high-speed chase. Detective Wilson likewise observed the Appellant driving the victim's Blazer and noticed two other "black males" in the vehicle with him.

At some point during the flight, the Appellant drove the Blazer across the state line into a wheatfield in northern Mississippi. The Appellant, Antonio Carpenter [the Appellant's brother], and Eric Glover [the Appellant's cousin] all fled from the vehicle. Antonio Carpenter and Glover were apprehended at the scene. Investigators seized $306 in cash and two gold earrings from Antonio Carpenter. Based upon information given to officers by Antonio Carpenter, Investigator Pugh returned to the Appellant's residence and proceeded along a dead end field road behind the house. Investigator Pugh described what he found as follows:

> It's just on a road—like I say, you get up there and you just run out of anywhere to go. First thing I noticed was a big snouzer (sic) laying down. When I noticed him, I stopped my patrol car and walked down to him. The dog layed there for a minute and then kind of run off. But where he was laying, I found the body of a white female in a ditch, in an indentation that had been covered up with—I thought it was horse blankets and a large log and some bushes. It looked like an attempt to conceal the body.

Investigator Pugh also found a number of personal items belonging to the victim including her purse, credit cards, bank receipts, and identification. Approximately fifty feet from the body, officers found a sawed-off semi-automatic .22 rifle. Along the road and near the body, officers further "located a number of Eddie Bauer clothes tags—clothes tags normally attached to new items of clothes when you purchase them."

Approximately four hours later, Detective Hill discovered the Appellant hiding in an abandoned car in northern Mississippi. At the time of his arrest, the Appellant was wearing the Eddie Bauer clothing pur-chased by the victim earlier that day. After being taken to the Marshall County, Mississippi, Sheriff's Department, the Appellant asked Detective Hill, "Do people who kill people go to hell?" When Detective Hill didn't reply, the Appellant stated, "Well, I guess I'm going to go to hell because we killed that lady."

The following statement was provided by the Appellant to Detective Ricky Wilson:

Q: Tell me why we are here?

A: Me, Antonio Carpenter and Eric Glover took a car in Collierville and the lady in it when we took it got killed.

Q: Tell me how she got killed?

A: She got choked and then run over by her car.

Q: Tell me how you got the ladies [sic] car.

A: At the Sonic in Collierville.

Q: Who was with you?

A: Antonio and Eric.

Q: How did you get in the car?

A: I opened the drivers door and told her to get over.

Q: Did you have a weapon?

A: Yes, a sawed off.

Q: Where did you get it?

A: In Byhalia from some guy named "Mont" who works at the Collierville Sonic.

Q: Who got in the Blazer with you?

A: Eric.

Q: Where did Antonio go?

A: He drove my car to NAPA and parked it.

Q: After you left NAPA where did you go?

A: Down Sycamore, went right down Keough through Rossville and went

home down the road in front of Troxel.

Q: Who was driving?

A: Me.

Q: Where was the lady sitting?

A: Passenger seat in front.

Q: Did she say anything to you?

A: Yes. She asked if she could take her medicine. I told her yes.

Q: Who took the money out of her purse?

A: One of them in the back. It was $200.

Q: Was the lady scared?

A: Yes.

Q: Why was she scared?

A: She said she was scared we were going to kill her.

Q: Did Antonio or Eric ask you to let her go?

A: No. They asked what we were going to do with her. I told them I hadn't made up my mind.

Q: Were you worried that she had seen your face?

A: No.

Q: Did she ask you to let her out?

A: Yes, several times.

Q: Why didn't you?

A: I was worried she would call the police.

Q: When you got home did you speak to anyone?

A: No.

Q: Did you speak to your sister?

A: No, I spoke to my brother Lemarcus.

Q: Where was the lady sitting when he saw her?

A: In the back.

Q: Was she alive or dead then?

A: Dead.

Q: At what point did you kill her?

A: Up the hill behind the house. I didn't kill her.

Q: After you killed her why did you load her into the truck?

A: I didn't kill her. Antonio and Eric put her in there.

Q: How was she killed?

A: Choked with my gun and ran over.

Q: Who choked her?

A: They both did.

Q: How did the lady come to be run over by the truck?

A: I have nothing else to say about this.

The statements given to police by the co-defendants, however, indicate that it was the Appellant who struck the victim in the head with the stock of the rifle before twice running over her body with the Blazer.

Dr. O.C. Smith, medical examiner for Shelby County, performed an autopsy on the victim. At trial, Dr. Smith testified that the victim "died as a result of blows to the head, crushing neck injuries, crushed chest, crushed abdomen and pelvis." Dr. Smith testified that these injuries were "massive" and consistent with the victim being run over by a motor vehicle. Dr. Smith also observed the presence of tire tracks on the left side of the victim's rib cage. Dr. Smith further noted that the victim had also sustained "blunt trauma to the head," an injury which would be consistent with being hit in the head with a rifle stock. He noted, however, that the blow to the head was not sufficient in and of itself to cause death because the blow "didn't damage the skull." Although Dr. Smith was unable to testify as to whether the victim was conscious or unconscious after the blow to the head, he was able to determine that she was alive during the remainder of the injuries. He further testi-

fied that the victim probably lived several minutes after the injuries were inflicted.

## I. SENTENCING

### A. Tennessee Code Ann. § 39–13–204(i)(5)

In the present case, the Appellant waived his right to have a jury determine his guilt and sentence. *See* Tenn.Code Ann. § 39–13–205. At the conclusion of the sentencing hearing, the trial court applied three aggravating circumstances: (1) that the murder was especially heinous, atrocious or cruel in that it involved torture, Tenn.Code Ann. § 39–13–204(i)(5); (2) that the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another, Tenn.Code Ann. § 39–13–204(i)(6); and (3) that the murder was knowingly committed, solicited, directed, or aided by the defendant, while the defendant had a substantial role in committing or attempting to commit, or was fleeing after having a substantial role in committing or attempting to commit robbery and/or kidnapping, Tenn.Code Ann. § 39–13–204(i)(7).

The Appellant does not contest the trial court's application of aggravators (i)(6) and (i)(7). Instead, the Appellant contends that the trial court erred in applying the (i)(5) aggravating factor, that the murder was especially heinous, atrocious or cruel in that it involved torture. *See* Tenn.Code Ann. § 39–13–204(i)(5). Specifically, the Appellant contends that the "[S]tate did not prove beyond a reasonable doubt that [the victim] was conscious when mortal blows were being dealt" and, as such, there was insufficient proof to establish that torture occurred.

■ It is the State's burden to prove each aggravating circumstance beyond a reasonable doubt. Tenn.Code Ann. § 39–13–207(c). If the [court] unanimously determines that the State has met this burden with respect to one or more of the statutory aggravating circumstances, then the [court] shall, in its consideration, sentence the defendant to either imprisonment for life without the possibility of parole or imprisonment for life. Tenn.Code Ann. § 39–13–207(c); *see also State v. Harris*, 989 S.W.2d 307 (Tenn.1999). In imposing the sentence, the [court] shall weigh and consider the statutory aggravating circumstances or circumstances proven by the State beyond a reasonable doubt and any mitigating circumstances. Tenn. Code Ann. § 39–13–207(d). In determining whether the evidence supports the finding of a statutory aggravating circumstance, the proper inquiry for an appellate court is whether, after reviewing the evidence in the light most favorable to the State, a rational trier of fact could have found the existence of the aggravating circumstance beyond a reasonable doubt. *See State v. Suttles*, 30 S.W.3d 252, 262 (Tenn.2000)

■ The "especially heinous, atrocious or cruel" aggravating circumstance "may be proved under either of two prongs: torture or serious physical abuse." *State v. Keen*, 31 S.W.3d 196, 206 (Tenn.2000)(citing *State v. Hall*, 8 S.W.3d 593, 601 (Tenn.1999)). Our supreme court has defined "torture" as "the infliction of severe physical or mental pain upon the victim while he or she remains alive and conscious." *Id.; State v. Morris*, 24 S.W.3d 788, 797 (Tenn.2000); *State v. Williams*, 690 S.W.2d 517, 529 (Tenn. 1985).

■ In this case, the Appellant contests the proof presented by the State to show that torture was involved. At the sentencing hearing, the State sought proof of torture through the testimony of the medical examiner, Dr. Smith, who was qualified as

an expert in torture, a recognized subspecialty of forensic pathology. Dr. Smith opined that torture involves dependency, degradation and dread. With respect to the application of these elements, Dr. Smith testified in relevant part as follows:

> The dependency is evidenced in the fact that the total control has been placed over the victim in her own vehicle and then she's taken away from her normal surroundings and put in an area that is totally controlled by the people who conducted her there. So she is entirely in their world. She is entirely dependent upon them because of the fear of injury or fear of hurting her dog that she cannot adequately resist. Evidence of the psychological depression that goes along with degradation is the realization that she—the comment that "you are going to kill me, aren't you?" Additionally, some of the further degradation with the incident, the family photos. They were sufficiently degrading comments. The dread is also seen where she realizes that she will probably not survive the incident. As a component of dread, execution is rapidly or is also obtained through the severe physical abuse, rapid physical assault in which the person may fear for their life or limb. And the injuries that are seen on [the victim] indicates that she did undergo a rapid severe physical assault such as she would be reasonably—if she were conscious, she should be reasonably afraid of her life and limb.

Our case law is clear that "[t]he anticipation of physical harm to oneself is torturous" so as to establish this aggravating circumstance. *Id.; see State v. Carter*, 988 S.W.2d 145, 150 (Tenn.1999) (citing cases from other jurisdictions); *see also Nesbit*, 978 S.W.2d at 886–87; *State v. Hodges*, 944 S.W.2d 346, 358 (Tenn.1997).

With regard to the proof establishing torture, testimony revealed that the victim was waiting for her order in the Sonic parking lot when the Appellant approached her brandishing a sawed off .22 rifle and ordered her to move into the passenger seat. As she complied, a second man crawled into the backseat of her Blazer and they left to pick up the third man, who had just moved the Appellant's car to the NAPA lot. On the way to the Carpenters' residence, the Appellant "look[ed] at pictures in her wallet and laugh[ed] at her, ask[ed] what kind of music she listened to. [The Appellant] asked how old her daughter was." In addition to being mocked and taunted, the victim's pleas for her life were refused because the Appellant "hadn't made up his mind" what he wanted to do with her yet. The Appellant drove the victim, along with the two other accomplices, several miles before taking her down a field road behind his house. The Appellant removed the victim from the vehicle. The victim stated, "you're going to kill me, aren't you" and pleaded with the men not to hurt her dog. Despite the victim's repeated pleas that "they could get a head start" if they just left her there "in the country", the Appellant took a rifle and struck the victim in the head, knocking her to the ground. The victim "continued to move around some." In the light most favorable to the State, we find this evidence sufficient to establish torture, *i.e.*, the infliction of severe physical or mental pain upon the victim while she remained alive and conscious.

### B. Mitigating Factors

The Appellant next argues that the trial court erred by "fail[ing] to find and weigh at least two statutory mitigating circumstances which were stipulated by the parties." Specifically, the Appellant contends that the trial court erred by not considering the following as mitigation proof: (1)

that the Appellant had already been sentenced to three consecutive sentences of life without the possibility of parole in federal court for his role in killing the victim; and (2) that Eric Glover, an equally culpable co-defendant, received a life sentence for his role in killing the victim.

First, we note that a trial court's consideration of a defendant's federal sentence as mitigation evidence is not an enumerated statutory mitigator under Tenn. Code Ann. § 39–13–204(j). Regardless, the Appellant cites no authority for his proposition that the length of his federal sentences should be considered as a mitigation factor during sentencing on the state charges. As such, the issue is waived. Tenn. R.App. P. 27(a).

Second, the Appellant argues that the trial court erred by failing to consider as mitigation evidence the sentence of Eric Glover, "an equally culpable co-defendant," who "received a simple sentence of life." Specifically, the Appellant argues that because the sentences received by equally culpable co-defendants are mitigating under the federal capital sentencing scheme, see 18 U.S.C. § 3592(a)(4), that they must also be proper mitigating evidence for consideration by a trial court during state sentencing.

We would acknowledge that our sentencing act encourages the elimination of disparate sentences when appropriate to assure "fair and consistent treatment of all defendants." Tenn.Code Ann. § 40–35–102(2). "Inequalities in sentences that are unrelated to a purpose in this chapter should be avoided." Tenn.Code Ann. § 40–35–103(3). When the provisions of Tenn.Code Ann. § 40–35–102 and § 40–35–103 are read together, they clearly permit trial courts to exercise their discretion in determining the sentencing alternatives or the length of the term of confinement, allowing differences in sentences justified by the nature of the crime, the characteristics and history of the criminal, and the circumstances surrounding the particular offense involved. *State v. Russell*, 773 S.W.2d 913, 915 (Tenn.1989). Furthermore, our supreme court has recognized "that a disparity in sentencing may exist where there is clearly a rational basis for the difference in sentences." *State v. Henley*, 774 S.W.2d 908, 918 (Tenn.1989); *see McGowen v. State*, 221 Tenn. 442, 427 S.W.2d 555, 560 (1968).

In this case, the proof establishes that the Appellant and Eric Glover were *not equally culpable.* It was the Appellant who possessed the rifle and drove to the Sonic; who orchestrated the kidnapping and robbery; who drove the victim to a remote location; who struck the victim in the head with the rifle and who inflicted the fatal injuries. While the co-defendant, Eric Glover, was a participant in the crimes, the facts do not indicate that his role was equal to that of the Appellant. Our sentencing code clearly supports an individualized, case-specific inquiry to determine the range of sentence and the manner in which multiple sentences should be served. *See* Tenn.Code Ann. §§ 40–35–105, –115. Because we do not find the Appellant and his co-defendant, Eric Glover, to be equally culpable, we find it unnecessary to address whether the sentence of an equally culpable co-defendant may be used as mitigation evidence during sentencing. This issue is without merit.

## II. DOUBLE JEOPARDY

The Appellant asserts that his trial in state court violates the double jeopardy provisions of the Fifth Amendment to the United States Constitution, Art. 1 § 10 of the Tennessee Constitution, and Art. 14 § 7 of the International Covenant on Civil and Political Rights since the Appellant

pled guilty to federal charges arising from the same criminal event.[2] The Appellant was indicted in the United States District Court for the Western District of Tennessee for crimes of (1) car jacking murder, 18 U.S.C. § 2119; (2) using a firearm during a crime of violence, 18 U.S.C. § 924(c)(1)(A)(ii); and (3) killing a potential federal witness, 18 U.S.C. § 1512(a). These indictments stem from the same criminal episode which gave rise to the Appellant's state charges for the murder, kidnapping and robbery of the victim, Barbara Ann Lee. On March 29, 2000, and while the Appellant's state charges were pending, the Appellant pled guilty in federal court to the indicted offenses and received three consecutive sentences of life imprisonment without the possibility of parole.

The long-standing doctrine regarding prosecution by· dual sovereignties is expressed in *United States v. Wheeler*, 435 U.S. 313, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978). "[A] federal prosecution does not bar a subsequent state prosecution of the same person for the same acts, and a state prosecution does not bar a federal one ... [P]rosecutions under the laws of separate sovereigns do not ... 'subject [the defendant] for the same offence to be twice put in jeopardy.'" *United States v. Wheeler*, 435 U.S. at 317, 98 S.Ct. at 1082–83.

■ The Appellant concedes that prosecution of the same offense by both state and federal governments is currently not barred under existing case law. Notwithstanding, the Appellant asks this court to find the dual sovereignty doctrine violative of the Tennessee constitution and argues for its abrogation. Tennessee courts specifically uphold and adhere to this doctrine of dual sovereignty. *Lavon v. State*, 586 S.W.2d 112, 113–14 (Tenn.1979). In *Lavon v. State*, our supreme court upheld the doctrine of dual sovereignty, reasoning as follows:

> There is no question but that such a procedure does not subject the defendant to double jeopardy insofar as the guaranty of due process in the 14th amendment of the federal constitution is concerned. *Bartkus v. Illinois*, 359 U.S. 121, 79 S.Ct. 676, 3 L.Ed.2d 684 (1959). While the rationale of this case that the state and federal governments are distinct sovereignties, and thus the punishment of a single act by each is not double jeopardy has been criticized, a similar approach has provided the basis for a more recent case, which would imply that Bartkus' analysis of the issue is still valid. See *United States v. Wheeler*, 435 U.S. 313, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978). This court is bound by the decisions of the United States Supreme Court concerning the proper interpretation of the federal constitution. *Townsend v. Clover Bottom Hospital and School*, 560 S.W.2d 623 (Tenn.1978). The double jeopardy provision of the Tennessee constitution, Article I, § 10, affords the defendant no greater protection. In the past, this provision has been interpreted to permit successive state and federal prosecutions on the basis of the same "dual sovereignties" analysis employed in Bartkus, supra, and, given the need for stability in constitutional interpretation, we see insufficient cause to depart from that precedent now.

---

2. "No person shall be held to answer for a capital, or otherwise infamous crime unless upon presentment of indictment by a grand jury ... nor shall any person be subject to the same offense to be twice put in jeopardy of life or limb." Fifth Amendment, United States Constitution. Similarly, Art. 1 § 10 of the Tennessee Constitution provides that "no person shall, for the same offenses, be twice put in jeopardy of life or limb."

*Lavon,* 586 S.W.2d at 113–114. The *Lavon* Court further explained that any modification or abandonment of the dual sovereignty doctrine must be accomplished through legislative action. *Id.* at 115. Such legislative action has yet to take place; thus, the doctrine of dual sovereignty remains in effect.

We further acknowledge that subsequent decisions of Tennessee courts have followed the precedent set forth in *Lavon.* *See State v. Holmes,* 995 S.W.2d 135 (Tenn.Crim.App.1998), *perm. to appeal denied,* (May 17, 1999)(As the United States and the State of Tennessee are clearly separate sovereigns, each has a right to prosecute an individual whose actions constitute "escape" under its definition. The fact that a defendant is prosecuted and convicted under both such laws is of no consequence with regard to double jeopardy.); *State v. Wyche,* 914 S.W.2d 558 (Tenn.Crim.App.1995)(the longstanding principle of dual sovereignty contemplates that a conviction for the same identical offense by a court of another sovereign does not constitute double jeopardy); *State v. Chitwood,* 735 S.W.2d 471 (Tenn. Crim.App.1987), *perm. to appeal denied,* (Aug. 3, 1987)(successive prosecutions by two states for the same conduct were not barred by the Double Jeopardy Clause of the Fifth Amendment); *State v. Crabtree,* 655 S.W.2d 173 (Tenn.Crim.App.1983)(under dual-sovereignty doctrine, a defendant can be prosecuted and convicted in both state and federal court upon the same evidence without offending the double jeopardy clause); *State v. Straw,* 626 S.W.2d 286 (Tenn.Crim.App.1981), *perm. to appeal denied,* (Oct. 3, 1981)(successive prosecutions for same offense by Massachusetts and Tennessee state courts did not subject defendant to double jeopardy in that doctrine of dual sovereignty prevails in Tennessee). As stated in *Lavon,* "established precedent, frequently reaffirmed by this court, and long accepted by the legislature, should not be departed from lightly." *Lavon,* 586 S.W.2d at 114. Based upon the foregoing reasons, we find this issue without merit.

Finally, the Appellant argues that the State's prosecution in this case violates the International Covenant on Civil and Political Rights (ICCPR), which is an international treaty of governing nations.[3] As the Appellant correctly points out, a properly ratified treaty is the supreme law of the land. U.S. Const. Art. VI § 2, cl. 2. In this case, the Appellant directs our attention to the language found in Art. 14 § 7 of the International Covenant on Civil and Political Rights, which reads as follows:

> No one shall be liable to be tried or punished again for an offence for which he has already been finally convicted or acquitted in accordance with the law and penal procedure of each country.

The Appellant argues that "international law does not recognize federal and state governments as separate sovereigns. Thus, for purposes of international law, the state/federal dual sovereign rule is not recognized as an exception to the [International Covenant on Civil and Political Rights]." The Appellant further contends that "Tennessee is bound by the International Covenant and cannot try [the Appellant] after he had been tried in federal court and sentenced for killing [the victim]."

First, we note that Art. 14 § 7 has been construed as barring only successive

---

**3.** The International Covenant on Civil and Political Rights was "entered into force" by the United Nations General Assembly on March 23, 1976. It is open for signature by any state member of the United Nations. On September 8, 1992, the United States became a party to the ICCPR upon its ratification by Congress.

prosecutions by the same governmental unit and not successive prosecutions by different sovereigns. *United States v. Benitez,* 28 F.Supp.2d 1361, 1364 (S.D.Fla. 1998).[4] "By its language, the ICCPR does not purport to regulate affairs between nations. Rather, the ICCPR is an international agreement prescribing how each state [which is a party to the treaty] is to treat individuals within its jurisdiction." *Id.* at 1363; *see also United States v. Duarte–Acero,* 208 F.3d 1282, 1286 (11th Cir.2000). (The clear language of the ICCPR manifests that its provisions are to govern the relationship between an individual and his state, and not the relationship between sovereigns).

■ In *Grandison v. Corcoran,* 78 F.Supp.2d 499, 513 (D.Md.2000), the defendant argued that his state prosecution constituted double jeopardy under the international treaty provisions because he was also subject to federal prosecution for the same underlying conduct. The *Grandison* court held that:

> Federal constitutional prohibitions against double jeopardy are not invoked when there are successive prosecutions on the same facts by separate sovereigns, which the federal and state governments are considered to be for this purpose, *see Abbate v. United States,*

359 U.S. 187, 79 S.Ct. 666, 3 L.Ed.2d 729 (1959), and nothing in the International Covenant on Civil and Political Rights (ICCPR) prevents successive federal-state prosecutions, for the reasons set forth in *United States v. Benitez,* 28 F.Supp.2d 1361, 1364 (S.D.Fla.1998)(discussing Senate's preservation of the *Abbate* doctrine in ratifying the ICCPR).

*Grandison v. Corcoran,* 78 F.Supp.2d 499, 513 (D.Md.2000). We find the reasoning of *Grandison* and *Benitez* persuasive and conclude that the International Covenant on Civil and Political rights does not prohibit a state from bringing a successive claim against a defendant who has already been the subject of a federal prosecution for the same underlying offense.

## CONCLUSION

When a challenge is made to a sentence of imprisonment for life without the possibility of parole, we are required to review the appropriateness of the sentence. Tenn.Code Ann. § 39–13–207(g). "A sentence of imprisonment for life without the possibility of parole shall be considered appropriate if the State proved beyond a reasonable doubt at least one statutory aggravating circumstance contained in § 39–13–204(i) and the sentence was not otherwise imposed arbitrarily, so as to con-

---

4. In ratifying the ICCPR, the Senate stated that the United States "understands the prohibition upon double jeopardy in paragraph 7 to apply only when the judgment of acquittal has been rendered by a court of the same government unit, as is seeking a new trial for the same cause." 138 Cong. Rec. S4781–01, S4783. The import of this qualification is that the Senate understood this paragraph to apply to a nation's internal prosecutions. The Senate wished to preserve the ability for the federal government and states to successively prosecute a person under the "dual sovereignties" exception to the Fifth Amendment double jeopardy bar.

*Benitez,* 28 F.Supp.2d at 1364.

Moreover, in this regard, we would note that Congress has no authority to relinquish that which it does not possess. Tenth Amendment, United States Constitution,

> The regulation and punishment of intrastate violence that is not directed at the instrumentalities, channels, or goods involved in interstate commerce has always been the province of the States.... [W]e can think of no better example of the police power, which the Founders denied the National Government and reposed in the States than the suppression of violent crime and vindication of its victims.

*United States v. Morrison,* 529 U.S. 598, 618, 120 S.Ct. 1740, 1754, 146 L.Ed.2d 658 (2000).

stitute a gross abuse of the [factfinders] discretion." Tenn.Code Ann. § 39–13–207(g); *Harris,* 989 S.W.2d at 316–19. In this case, the proof supports the three aggravating circumstances applied by the court. We have also reviewed the mitigating circumstances found by the trial court. After final review, we conclude that the sentence imposed by the trial court does not constitute a gross abuse of sentencing discretion nor have double jeopardy principles been compromised. Accordingly, we find that the Appellant's sentence of life without the possibility of parole is appropriate punishment in this case. The judgment of the Fayette County Circuit Court is affirmed.